Carroll McNulty & Kull, LLC.
570 Lexington Avenue, 10th Floor
New York, New York 10022
(212) 252-0004

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
MEDITERRANEAN SHIPPING COMPANY
(USA) INC.,

                                             **09 Civ. 8809 (CM)**

                     *Plaintiff,*

      *- against -*                          **VERIFIED COMPLAINT AND**
                                       **RULE B ATTACHMENT**

INTERNATIONAL FIBER EXCHANGE,

                     *Defendant.*
----------------------------------------------------------x

    Plaintiff, MEDITERRANEAN SHIPPING COMPANY (USA) INC., (hereinafter "MSC") by its attorneys, Carroll McNulty & Kull, LLC., as and for its Verified Complaint against Defendant INTERNATIONAL FIBER EXCHANGE, (hereinafter "IFE"), alleges upon information and belief as follows:

    1. This is an admiralty and maritime action within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and 28 U.S.C. §1333;

    2. Venue is proper under 28 U.S.C. §§1391(d) as defendant is an alien and because the bill of lading contract entered into between MSC and IFE makes this Court the exclusive forum for disputes arising thereunder;

    3. At all times hereinafter mentioned, plaintiff, MSC, was and still is a corporation organized and existing pursuant to the laws of the State of New York, with its primary place of business

located at 420 Fifth Avenue, New York, New York, and was at all times the agent of Mediterranean Shipping company S.A.;

4. Upon information and belief, at all times hereinafter mentioned, defendant IFE, was and still is a corporation or other form of business entity organized and existing pursuant to the laws of one of the fifty United States, but not New York State, with an office and place of business located at 213 A Second Street, Sausalito, California, 94965;

5. On or about August 10, 2007, IFE and MSC entered into a bill of lading contract of carriage pursuant to which, IFE agreed to tender and MSC agreed to carry two 40-foot metal shipping containers said by IFE to contain bales of waste paper, from the port of Boston, Massachusetts, to the port of Nhava Sheva, India, and there to deliver them to the order of IFE;

6. Bill of lading MSCUBT200132, was issued by MSC to IFE, which incorporated MSC's standard form bill of lading contract which is maintained as a part of MSC's tariff, as required by the Federal Maritime Commission. Annexed hereto as **Exhibit A** is a copy of the bill of lading issued by MSC to IFE. Annexed hereto as **Exhibit B** is a copy of the standard terms and conditions that apply to the contract of carriage, as printed-off from MSC's internet website;

7. On or about September 21, 2007, the two 40-foot shipping containers carried under the bill of lading contract were discharged at the port of Nhava Sheva, India, from the m/v MSC BRIANNA, and made available for pick-up. IFE and/or the party indicated by IFE to receive notice of the arrival of the cargo, was given the customary notice;

8. On or about February 17, 2008, MSC gave IFE written notice that the two containers carried under bill of lading MSCUBT200132, had not yet been cleared from the terminal and that IFE, as the shipper on the bill of lading, was liable for all charges associated with the delay in

arranging delivery. Annexed hereto as **Exhibit C** is a copy of MSC's notice to IFE dated February 17, 2008;

9. In breach of its obligations under the bill of lading contract, IFE failed to have the two containers picked-up and instead, left the containers sitting on the marine terminal at the port of Nhava Sheva, India, where they accrued demurrage, detention, local port charges and/or storage charges, from September 26, 2007, until March 24, 2009, when the local authorities allowed MSC to have the cargo devanned and the containers returned to its service. The accrued demurrage, detention, local charges and/or storage charges incurred as a result of IFE's failure to arrange delivery of the cargo was US$147,635.75, for which IFE was invoiced on March 30, 2009; April 30, 2009; and June 8, 2009. Annexed hereto as **Exhibit D** are copies of the invoices sent to IFE by MSC;

10. As the shipper of the cargo under the bill of lading contract, IFE is liable for all charges incurred by the cargo as a result of any delay in arranging delivery of the cargo at the port of discharge, including any legal fees incurred by MSC in enforcing its rights under the bill of lading contract;

11. Plaintiff, MSC, brings this action on its own behalf and as agent for Mediterranean Shipping Company S. A., and/or any other party with an interest in the subject matter hereof and has fulfilled all conditions precedent incumbent upon it;

12. The defendant IFE, cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions of the Federal Rules of Civil Procedure, but, upon information and belief, defendant has, or will have during the pendency of this action, assets, goods or chattels and effects within this District and subject to the jurisdiction of this Court, held in the hands of garnishees including, but not limited

to: Bank of America, N.A.; Bank of China; The Bank of New York; Citibank, N.A.; Deutsche Bank Trust Company Americas; HSBC Bank USA, N.A.; JPMorgan Chase Bank, N.A.; UBS AG; Wachovia Bank, N.A.; Société Générale; Standard Chartered Bank; BNP Paribas; Calyon Investment Bank; American Express Bank; Commerzbank; ABN Amro Bank; Bank Leumi USA; Banco Popular; China Trust Bank; Industrial Bank of Korea; Shin Ha Bank; Great Eastern Bank; Nara Bank; United Orient Bank; The Clearing House Interbank Payments System LLC; The New York Clearing House Association LLC, which are believed to be due and owing to the defendants;

13.     The plaintiff, MSC seeks an Order from this Court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions of the Federal Rules of Civil Procedure attaching any assets of the defendant held by the aforesaid garnishees for the purpose of obtaining personal jurisdiction over the defendant, and to secure and/or satisfy the plaintiff's claims as described above;

**WHEREFORE**, Plaintiff prays:

A.     That process in due form of law issue against the defendant, INTERNATIONAL FIBER EXCHANGE, citing the defendant to appear and answer under oath all and singular the matters alleged in the Complaint;

B.     That since the defendant cannot be found within this District pursuant to Rule B of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions of the Federal Rules of Civil Procedure, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to the said Rule B of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions of the

4

Federal Rules of Civil Procedure, attaching all tangible or intangible property in whatever form or any other funds held by any garnishee, including, but not limited to: Bank of America, N.A.; Bank of China; The Bank of New York; Citibank, N.A.; Deutsche Bank Trust Company Americas; HSBC Bank USA, N.A.; JPMorgan Chase Bank, N.A.; UBS AG: Wachovia Bank, N.A.; Société Générale; Standard Chartered Bank; BNP Paribas; Calyon Investment Bank; American Express Bank; Commerzbank; ABN Amro Bank; Bank Leumi USA; Banco Popular; China Trust Bank; Industrial Bank of Korea; Shin Ha Bank; Great Eastern Bank; Nara Bank; United Orient Bank; The Clearing House Interbank Payments System LLC; The New York Clearing House Association LLC, which are believed to be due and owing to the defendant AIC Limited of Hamilton Bermuda in the amount of **US$147,635.75,** to satisfy and/or secure plaintiff's claims, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B to answer the matters alleged in the Complaint;

C.     That judgment be entered in favor of plaintiff, MEDITERRANEAN SHIPPING COMPANY (USA) INC., and against defendant, INTERNATIONAL FIBER EXCHANGE, in the amount of US$147,635.75, with interest, costs and disbursements of this action;

D.     That in accordance with the governing contract of carriage, the Court award plaintiff, MEDITERRANEAN SHIPPING COMPANY (USA) INC., its reasonable attorney fees, incurred in this matter; and

E.     That the plaintiff has such other, further and different relief as the Court may deem just and proper.

Dated:  New York, New York
         October 12, 2009

**Carroll McNulty & Kull, LLC.**
*Attorneys for Plaintiff*
MEDITERRANEAN SHIPPING COMPANY
(USA) INC.

By:_____
   John A. Orzel
   570 Lexington Avenue, 10th Floor
   New York, New York 10022
   (212) 252-0004

## **VERIFICATION**

John A. Orzel declares and states that he is a member in the law firm of Carroll McNulty & Kull, LLC., attorneys for Plaintiff in this action, and that the foregoing Verified Complaint is true to his knowledge, except as to matters therein stated on the information and belief and as to those matters, he believes them to be true; that the ground of his belief as to all matters not stated upon knowledge is information furnished to him to by Plaintiff and that he is authorized by the Plaintiff to so verify.

I declare and state under penalty of perjury that the foregoing is true and correct.

Executed on October 12, 2009

John A. Ørzel

*MEDITERRANEAN SHIPPING COMPANY (USA) INC.*

**Exhibit A to Verified Complaint**

See reverse for terms, except if the reverse / the pages Web you license y | conditions | Complete Cargo 0ffice procurement : | Abstract (reprint) | 船舶運送約款等 | www.mscmedshipco.com

| **msc** | **MEDITERRANEAN SHIPPING COMPANY S.A.** | **SEA WAYBILL No.** | **MSCUTM504985** |
|---|---|---|---|

**NOT-NEGOTIABLE COPY** — "Port-to-Port" or "Combined Transport" (see Clause 1)

| Website: www.mscmedshipco.com | SCAC Code : MSCU | NO. & SEQUENCE OF SEA WAYBILLS: 0 Of Zero | NO. OF RIDER PAGES: 0 |
|---|---|---|---|

| SHIPPER: INTER-CARGO, INC. C/O DANIEL FARRAR 1990 NW 95 AVENUE MIAMI, FL 33172--USA | REF #: SOL04273 | FORWARDING AGENT : ALONSO SHIPPING CO. FMC 305-R MIAMI, FL MIAMI, FL 33173 | FMC #: 3050R REF #: |
|---|---|---|---|

| CONSIGNEE: DANIEL MARTIN FARRAR JUJUY 1084 CAPITAL FEDERAL BUENOS AIRES, ARGENTINA TEL 4943-0773 | CARRIER'S AGENTS ENDORSEMENTS: (Include Agent(s) at POD) |
|---|---|

| NOTIFY PARTIES: (No responsibility shall attach to the Carrier or to his Agent for failure to notify - see Clause 20) DANIEL MARTIN FARRAR JUJUY 1084 CAPITAL FEDERAL BUENOS AIRES, ARGENTINA TEL 4943-0773 | |
|---|---|

| VESSEL & VOYAGE NO. (see Clauses 8 & 9) MSC GINA - 270R | PORT OF LOADING PORT EVERGLADES, FL | PLACE OF RECEIPT: (Combined Transport ONLY - see Clauses 1 & 5.2) XXXXXXXXXXXXXXXX |
|---|---|---|

| BOOKING REF. MIA061115 | SERVICE CONTRACT NUMBER XXXXXXXXXXXXX | PORT OF DISCHARGE BUENOS AIRES, ARGENTINA | PLACE OF DELIVERY : (Combined Transport ONLY - see Clauses 1 & 5.2) XXXXXXXXXXXXXXXX |
|---|---|---|---|

**P A R T I C U L A R S   F U R N I S H E D   B Y   T H E   S H I P P E R - N O T   C H E C K E D   B Y   C A R R I E R  -  C A R R I E R   N O T   R E S P O N S I B L E - See Clause 14**

| Container Numbers, Seal Numbers and Marks | Description of Packages and Goods (Continued on attached Sea Waybill Rider page(s), if applicable) | Gross Cargo Weight | Measurement |
|---|---|---|---|
| MSCU7892939 40' HIGH CUBE SEAL NUMBER: 38064 | 3 UNIT(S) OF VEHICLES: 1990 MERCEDES 300E BEIGE VIN#WDBEA30D2LB250631

1997 MERCEDES E320 VIN#WDBJF55F9VA334377

1997 JEEP CHEROKEE VIN 1J4FX58S2VC558960

NO SED REQUIRED. AES - 30.55

TOTAL NUMBER OF PACKAGES :3 | 12,811.000LBS 5,810.972KGS

TOTAL : 5,810.972KGS 12,811.000LBS | |

If above commodities, technology or software were exported from the USA, the export administration regulations must be complied with by the Merchant. Diversion contrary to US law is prohibited

**FREIGHT & CHARGES**  Cargo shall not be delivered unless Freight & charges are paid (see Clause 16).

| FREIGHT AND CHARGES | BASIS | RATE | PAYABLE AT | | | |
|---|---|---|---|---|---|---|
| | | | POL | POD | ELSEWHERE | |
| CONTAINER SERVICE CHARGE (BUE) | 1 | 140.00 | | 140.00 | | |
| OCEAN FREIGHT | 1 | 500.00 | USD 500.00 | | | |
| RIVER PLATE TOLL FEE | 1 | 90.00 | | USD 90.00 | | |
| | | | USD 500.00 | 230.00 | | |

RECEIVED by the Carrier from the Shipper in apparent good order and condition unless otherwise stated herein the total number or quantity of containers or other packages or units indicated in box entitled "Carrier's Receipt" for carriage subject to all the terms hereof from the Place of Receipt or the Port of Loading, to the Port of Discharge or Place of Delivery, whichever is applicable. IN ACCEPTING THIS SEA WAYBILL THE SHIPPER EXPRESSLY ACCEPTS AND AGREES TO, ON HIS OWN BEHALF AND ON BEHALF OF THE CONSIGNEE, THE OWNER OF GOODS AND THE MERCHANT, AND WARRANTS HE HAS AUTHORITY TO DO SO, ALL THE TERMS AND CONDITIONS WHETHER PRINTED, STAMPED OR OTHERWISE INCORPORATED ON THIS AND ON THE REVERSE SIDE AND TERMS AND CONDITIONS OF THE CARRIER'S APPLICABLE TARIFF AS IF THEY WERE ALL SIGNED BY THE SHIPPER.

Unless instructed otherwise in writing by the Shipper delivery of the Goods will be made only to the Consignee or his authorized representatives. This Sea Waybill is not a document of title to the Goods and delivery will made, after payment of any outstanding Freight and changes, only on provision of proper proof of identity and authorization at the Port of Discharge or Place of Delivery, as appropriate, without the need to produce or surrender a copy of this Sea Waybill.

IN WITNESS WHEREOF the Carrier, Master or their Agent has signed this Sea Waybill.

| DECLARED VALUE (only applicable if Ad Valorem Charges paid - see Clause 7.3) XXXXXXXXXXXXXXXX | CARRIER'S RECEIPT (No. of Cntrs or Pkgs rcvd by Carrier - see Clause 14.1) 1 cntr | SIGNED By MSC (USA) Inc. as Agent on behalf of the Carrier MSC Mediterranean Shipping Company S.A. |
|---|---|---|
| PLACE AND DATE OF ISSUE MIAMI - 31-JANUARY-2007 | SHIPPED ON BOARD DATE 31-JANUARY-2007 | |

Sea Waybill U.S. Edition - 08/2009            TERMS CONTINUED ON REVERSE ↧

*MEDITERRANEAN SHIPPING COMPANY (USA) INC.*

**Exhibit B to Verified Complaint**

 **MEDITERRANEAN SHIPPING COMPANY**

## Standard Terms & Conditions of the Contract of Carriage

## Front



RECEIVED by the Carrier in apparent good order and condition (unless otherwise stated herein) the total number or quantity of Containers or other packages or units indicated in the box entitled Carrier's Receipt for carriage subject to all the terms and conditions hereof from the Place of Receipt or Port of Loading to the Port of Discharge or Place of Delivery, whichever is applicable. IN ACCEPTING THIS BILL OF LADING THE MERCHANT EXPRESSLY ACCEPTS AND AGREES TO ALL THE TERMS AND CONDITIONS, WHETHER PRINTED, STAMPED OR OTHERWISE INCORPORATED ON THIS SIDE AND ON THE REVERSE SIDE OF THIS BILL OF LADING AND THE TERMS AND CONDITIONS OF THE CARRIER'S APPLICABLE TARIFF AS IF THEY WERE ALL SIGNED BY THE MERCHANT. If this is a negotiable (To Order / of) Bill of Lading, one original Bill of Lading, duly endorsed must be surrendered by the Merchant to the Carrier (together with outstanding Freight) in exchange for the Goods or a Delivery Order. If this is a non-negotiable (straight) Bill of Lading, the Carrier shall deliver the Goods or issue a Delivery Order (after payment of outstanding Freight) against the surrender of one original Bill of Lading or in accordance with the national law at the Port of Discharge or Place of Delivery whichever is applicable. IN WITNESS WHEREOF the Carrier or their Agent has signed the number of Bills of Lading stated at the top, all of this tenor and date, and wherever one original Bill of Lading has been surrendered all other Bills of Lading shall be void.

[Signature]

## Reverse



**Terms and conditions of MSC Mediterranean Shipping Company S.A.**
**Contract of Carriage continued from the reverse.**

DEFINITIONS
CONTRACTING PARTIES AND WARRANTY
CARRIER'S TARIFF
SUBCONTRACTING AND INDEMNITY
CARRIER'S RESPONSIBILITY
U.S. TRADE CLAUSE
COMPENSATION AND LIABILITY PROVISIONS
SCOPE OF VOYAGE, DELAY, CONSEQUENTIAL DAMAGES
METHODS AND ROUTES OF CARRIAGE
NOTICE OF CLAIMS, TIME BAR AND JURISDICTION
MERCHANT-PACKED CONTAINERS
REFRIGERATION, HEATING, INSULATION
INSPECTION OF GOODS AND SPECIAL CIRCUMSTANCES
DESCRIPTION OF GOODS AND MERCHANT'S RESPONSIBILITY
DANGEROUS OR HAZARDOUS GOODS

16. FREIGHT AND CHARGES
17. CARRIER'S LIEN
18. OPTIONAL STOWAGE, DECK CARGO AND LIVESTOCK
19. MATTERS ADVERSELY AFFECTING CARRIER'S PERFORMANCE
20. NOTIFICATION AND DELIVERY
21. BOTH TO BLAME COLLISION CLAUSE
22. GENERAL AVERAGE AND SALVAGE
23. SEPARABILITY AND VARIATION OF TERMS, FINAL CONTRACT

## 1. DEFINITIONS

The following definitions shall apply in this Bill of Lading:

**Carrier**: means MSC Mediterranean Shipping Company S.A..

**COGSA**: means the U.S. Carriage of Goods by Sea Act, 1936.

**Combined Transport**: arises if the Carrier has indicated a Place of Receipt and/or a Place of Delivery on the front hereof in the relevant spaces. Combined Transport consists of a Port-to-Port carriage and Inland Transport.

**Container**: includes any container, trailer, transportable tank, flat or pallet, or any similar article used to consolidate Goods and any connected or accessory equipment.

**Freight**: includes the freight and all charges, costs and expenses whatsoever payable to the Carrier in accordance with the applicable Tariff and this Bill of Lading, including storage, per diem and demurrage.

**Goods**: includes the whole or any part of the cargo carried under this Bill of Lading, including any packing or packaging materials and Merchant owned or leased Containers.

**Hague Rules**: means the provisions of the International Convention for the Unification of Certain Rules relating to Bills of Lading signed at Brussels on 25 August 1924 with the express exclusion of Article 9.

**Hague–Visby Rules**: means the provisions of The Hague Rules 1924 as Amended by the Protocol adopted at Brussels on 23 February 1968, and 21st December 1979 (SDR Protocol) where applicable. Notwithstanding anything to the contrary herein it is expressly agreed that nothing herein shall contractually apply the Hague-Visby Rules to this Bill of Lading and they shall apply only when compulsorily applicable by the law governing this Bill of Lading.

**Inland Transport**: means carriage during Combined Transport other than between the Port of Loading and the Port of Discharge.

**Merchant**: includes the Shipper, Consignee, holder of this Bill of Lading, the receiver of the Goods and any Person owning, entitled to or claiming the possession of the Goods or of this Bill of Lading or anyone acting on behalf of this Person.

**Person**: includes an individual, corporation, company or any other legal entity.

**Place of Delivery**: means the place at which the Carrier has contracted to deliver the Goods, when such place is other than the Port of Discharge.

**Place of Receipt**: means the place at which the Carrier has contracted to receive the Goods, when such place is other than the Port of Loading.

**Pomerene Act**: means the United States Federal Bill of Lading Act, 1916 49 U.S.C. 801 or any amendments thereto.

**Port-to-Port carriage**: means carriage between the Port of Loading and the Port of Discharge.

**Subcontractor**: includes but is not limited to the owners, charterers and operators of the Vessel(s) other than the

Carrier, as well as stevedores, terminals and groupage operators, road and rail transport operators, warehousemen and any independent contractors employed by the Carrier performing the carriage and any direct or indirect Subcontractors, servants and agents thereof whether in direct contractual privity or not.

**Vessel:** includes the vessel named herein or any substituted vessel, feeder vessel, lighter or other watercraft utilized by the Carrier for carriage by sea.

Top

## 2. CONTRACTING PARTIES AND WARRANTY

**The contract evidenced by this Bill of Lading is between the Carrier and the Merchant. Every Person defined as "Merchant" is jointly and severally liable towards the Carrier for all the various undertakings, responsibilities and liabilities of the Merchant under or in connection with this Bill of Lading and to pay the Freight due under it without deduction or set-off. The Merchant warrants that in agreeing to the terms and conditions in this Bill of Lading, he is the owner of the Goods or he does so with the authority of the owner of the Goods or of the Person entitled to the possession of the Goods or of this Bill of Lading.**

Top

## 3. CARRIER'S TARIFF

The terms and conditions of the Carrier's applicable Tariff are incorporated into this Bill of lading. Particular attention is drawn to terms and conditions concerning additional charges including demurrage, per diem, storage expenses and legal fees, etc. A copy of the applicable Tariff can be obtained from the Carrier or its agent upon request and the Merchant is deemed to know and accept such Tariff. In the case of any conflict or inconsistency between this Bill of Lading and the applicable Tariff, it is agreed that this Bill of Lading shall prevail.

Top

## 4. SUBCONTRACTING AND INDEMNITY

4.1 The Carrier shall be entitled to sub-contract on any terms whatsoever the whole or any part of the carriage, including liberty to further sub-contract.

4.2 The Merchant undertakes that no claim or allegation whether arising in contract, bailment, tort or otherwise shall be made against any servant, agent, or Subcontractor of the Carrier which imposes or attempts to impose upon any of them or any Vessel owned or chartered by any of them any liability whatsoever in connection with the Goods or the carriage of the Goods whether or not arising out of negligence on the part of such Person. If any such claim or allegation should nevertheless be made, the Merchant agrees to indemnify the Carrier against all consequences thereof. Without prejudice to the foregoing, every such servant, agent and Subcontractor shall have the benefit of all terms and conditions of whatsoever nature contained herein or otherwise benefiting the Carrier under this Bill of Lading, as if such terms and conditions were expressly for their benefit. In entering into this contract, the Carrier, to the extent of such terms and conditions, does so on its own behalf and also as agent and trustee for such servants, agents and Subcontractors.

4.3 The provisions of clause 4.2, including but not limited to the undertaking of the Merchant contained therein, shall extend to all claims or allegations of whatsoever nature against other Persons chartering space on the Vessel.

4.4 The Merchant further undertakes that no claim or allegation in respect of the Goods shall be made against the Carrier by any Person which imposes or attempts to impose upon the Carrier any liability whatsoever in connection with the Goods or the carriage of the Goods other than in accordance with the terms and conditions of this Bill of Lading, whether or not arising out of negligence or misdelivery on the part of the Carrier, and if any such claim or allegation should nevertheless be made, to indemnify the Carrier against all consequences thereof.

## 5. CARRIER'S RESPONSIBILITY

5.1 **Port-to-Port carriage** – If carriage under this Bill of Lading is Port-to-Port:

(a) The period of responsibility of the Carrier for any loss of or damage to the Goods shall commence only at the moment that the Goods are loaded on board the Vessel and shall end when the Goods have been discharged from the Vessel.

(b) This Bill of Lading shall be subject to the Hague Rules unless the governing law makes the Hague or the Hague-Visby Rules compulsorily applicable in which case the said Hague or Hague-Visby Rules will apply to this Bill of Lading only to the extent that they are compulsorily applicable.

(c) Notwithstanding the above, in case and to the extent that the governing law, or a contractual arrangement, or custom and practice, or any court or tribunal decision extends the Carrier's period of responsibility whether in contract, tort, bailment or otherwise to all or any part of the period before loading, or the period after discharge, including for misdelivery, then Carrier shall have the benefit of every right, defence, immunity, limitation and liberty provided for in the Hague Rules during such additional period of responsibility, notwithstanding that the loss, damage or misdelivery did not occur during the carriage by sea.

5.2 **Combined Transport** – The Carrier's liability for Combined Transport shall be as follows: 5.2.1 Where the loss or damage occurred during the Port-to-Port section of the carriage, the liability of the Carrier is in accordance with clause 5.1 above.

5.2.2 Where the loss or damage occurred during Inland Transport, the liability of the Carrier shall be determined:

(a) by the provisions contained in any international convention, national law or regulation applicable to the means of transport utilized, if such convention, national law or regulation would have been compulsorily applicable in the case where a separate contract had been made in respect to the particular stage of transport concerned, or

(b) where no international convention, national law or regulation would have been compulsorily applicable, by the contract of carriage issued by the Subcontractor carrier for that stage of transport, including any limitations and exceptions contained therein, which contract the Merchant and the Carrier adopt and incorporate by reference, it being agreed that the Carrier's rights and liabilities shall be the same as those of the Subcontractor carrier, but in no event whatsoever shall the Carrier's liability exceed GBP 100 sterling legal tender per package, or

(c) if any court shall determine that no international convention, national law or regulation would have been compulsorily applicable and that the Carrier may not determine its liability, if any, by reference to the applicable Subcontractor's contract of carriage or where said Subcontractor carrier does not have a contract of carriage, then it is contractually agreed as between the Merchant and the Carrier that the Carrier's liability shall be determined as if the loss and/or damage complained of occurred during the Port-to-Port section of carriage as provided at 5.1 above, but in no event whatsoever shall the Carrier's liability exceed GBP 100 sterling legal tender per package.

(d) If the place of loss or damage cannot be established by the Merchant, then the loss or damage shall be presumed to have occurred during the Port-to-Port section of carriage and the Carrier's liability shall be determined as provided at 5.1 above.

5.2.3 Any transport that the Carrier arranges for the Merchant which is not part of the carriage under this Bill of Lading is done under the Merchant's own responsibility, time, risk and expense and the Carrier acts as agent only for the Merchant.

5.3 **Delivery to Customs or Port Authorities** – Where any law or regulation applicable at the Port of Discharge or Place of Delivery provides that delivery of the Goods to the Merchant shall or may be effected by the customs or port authorities at the Port of Discharge or Place of Delivery, notwithstanding anything to the contrary herein, delivery of the Goods by the Carrier to such customs or port authorities shall be deemed to be lawful delivery of the Goods by the Carrier to the Merchant and the Carrier shall not be liable for any loss of or damage to the Goods which occurs for any reason whatsoever after delivery of the Goods by the Carrier to the customs or port authorities.

Top

## 6. U.S. TRADE CLAUSE

6.1 Notwithstanding the provisions of clause 5, for carriage to or from any port of the United States, its territories or possessions, or if suit is brought in the United States, this Bill of Lading shall have effect subject to the provisions of the COGSA and to the provisions of the Pomerene Act regardless of whether said Act would apply of its own force. The provisions of the COGSA are incorporated herein and save as otherwise provided herein shall apply throughout the entire time the Goods are in the Carrier's custody, including before loading and after discharge as long as the Goods remain in the custody of the Carrier or its Subcontractors, including cargo carried on deck. Nothing contained herein is to be deemed a surrender by the Carrier of its rights, immunities, exemptions or limitations or an increase of any of its responsibilities or liabilities under the COGSA. Except for clause 5, every other term, condition, limitation, defence and liberty whatsoever contained in this Bill of Lading shall apply to carriage in the US Trades.

6.2 For limitation purposes under the GOGSA, it is agreed that the meaning of the word "package" shall be any palletised and/or unitised assemblage of cartons which has been palletised and/or unitised for the convenience of the Merchant, regardless of whether said pallet or unit is disclosed on the front hereof.

Top

## 7. COMPENSATION AND LIABILITY PROVISIONS

7.1 Subject always to the Carrier's right to limit liability as provided for herein, if the Carrier is liable for compensation in respect of loss of or damage to the Goods, such compensation shall be calculated by reference to the invoice value of the Goods, plus Freight and insurance if paid. If there is no invoice value of the Goods or if any such invoice is not bona fide, such compensation shall be calculated by reference to the market value of such Goods at the place and time they are delivered or should have been delivered to the Merchant. The market value of the Goods shall be fixed according to the current market price, by reference to the normal value of goods of the same kind and/or quality.

7.2 Save as is provided in clause 7.3:

7.2.1 (a) If and to the extent the Hague Rules or Hague-Visby Rules are compulsorily applicable to this Bill of Lading by virtue of clauses 5.1, 5.2.1 or 5.2.2 (c) or (d) or otherwise, the Carrier's liability for breaches or wrongs occurring during such period of compulsory application shall in no event whatsoever exceed the amounts provided in the Hague Rules or Hague-Visby Rules, whichever are compulsorily applicable.

(b) If and to the extent the Hague Rules apply only contractually pursuant to clause 5, the Carrier's maximum liability shall in no event whatsoever exceed GBP 100 sterling lawful currency per package or unit.

7.2.2 Where COGSA applies by virtue of clause 6, neither the Carrier nor the Vessel shall in any event be or become liable in an amount exceeding US$500 per package or per customary freight unit.

7.3 The Merchant agrees and acknowledges that the Carrier has no knowledge of the value of the Goods. Higher compensation than that provided for in this Bill of Lading may be claimed only when, with the written confirmation of the Carrier, the value of the Goods declared by the Shipper upon delivery to the Carrier has been stated by the Carrier in the box marked "Declared Value" on the front of this Bill of Lading and ad valorem charges paid. In that case, the amount of the Declared Value shall be substituted for the limits provided in this Bill of Lading. Any partial loss or damage shall be adjusted pro rata on the basis of such Declared Value.

7.4 Nothing in this Bill of Lading shall operate to limit or deprive the Carrier of any statutory protection, defence, exemption or limitation of liability authorised by any applicable laws, statutes or regulations of any country or which would have been applicable in the absence of any of the terms set out in this Bill of Lading. The Carrier shall have the benefit of the said laws, statutes or regulations as if it were the owner of the Vessel.

7.5 When any claim is paid by the Carrier to the Merchant, the Carrier shall be automatically subrogated to all rights of the Merchant against any third party. The Merchant shall sign a subrogation receipt, release and indemnity immediately when requested by the Carrier.

Top

## 8. SCOPE OF VOYAGE, DELAY, CONSEQUENTIAL DAMAGES

The scope of voyage herein contracted for may or may not include usual or customary or advertised ports of call whether named in this Bill of Lading contract or not and may include transport of the Goods to or from any facilities used by the Carrier as part of the carriage, including but not limited to off-dock storage. The Carrier does not promise or undertake to load, carry or discharge the Goods on or by any particular Vessel, date or time. Advertised sailings and arrivals are only estimated times, and such schedules may be advanced, delayed or cancelled without notice. In no event shall the Carrier be liable for consequential damages or for any delay in scheduled departures or arrivals of any Vessel or other conveyances used to transport the Goods by sea or otherwise. If the Carrier should nevertheless be held legally liable for any such direct or indirect or consequential loss or damage caused by such alleged delay, such liability shall in no event exceed the Freight paid for the carriage.

Top

## 9. METHODS AND ROUTES OF CARRIAGE

9.1 The Carrier may at any time and without notice to the Merchant:

(a) use any means of transport or storage whatsoever;

(b) transfer the Goods from one conveyance to another including transhipping or carrying the Goods on a Vessel other than the Vessel named on the front hereof or by any other means of transport whatsoever, even though transhipment or forwarding of the Goods by such means may not have been contemplated or provided for herein;

(c) sail without pilots, proceed via any route (whether or not the nearest or most direct or customary or advertised route) at any speed and proceed to, return to and stay at any port or place whatsoever (including the Port of Loading herein provided) once or more often, and in any order in or out of the route or in a contrary direction to or beyond the Port of Discharge once or more often;

(d) load and unload the Goods at any place or port (whether or not any such port is named on the front hereof as the Port of Loading or Port of Discharge) and store the Goods at any such port or place, including but not limited to the use of off-dock storage at any port;

(e) comply with any orders or recommendations given by any government or authority or any Person or body purporting to act as or on behalf of such government or authority or having under the terms of the insurance on any conveyance employed by the Carrier the right to give orders or directions.

9.2 The liberties set out in clause 9.1 may be invoked by the Carrier for any purpose whatsoever whether or not connected with the carriage of the Goods, including but not limited to loading or unloading other goods, bunkering or embarking or disembarking any Person(s), undergoing repairs and/or drydocking, towing or being towed, assisting other vessels, making trial trips and adjusting instruments. Anything done or not done in accordance with clause 9.1 or any delay arising therefrom shall be deemed to be within the contractual carriage and shall not be a deviation.

Top

## 10. NOTICE OF CLAIMS, TIME BAR AND JURISDICTION

10.1 **Notice** - of loss or damage to Goods shall be given in writing to the Carrier or its agent at the Port of Discharge

MSC - Standard terms & conditions of the contract of carriage
Case 1:09-cv-08809-CM of Document Jr Filed 10/16/2009 Page 17 of 29 7 of 13
Page 7 of 13

before or at the time of delivery. If the loss or damage is not apparent before or at the time of delivery, notice must be given within three (3) days of delivery to the Merchant or its agent. Claims shall be submitted in writing addressed by the Merchant to the Carrier's agent at the Port of Discharge.

10.2 **Time bar** - In any event, the Carrier shall be discharged from all liability if suit is not commenced within one (1) year after delivery of the Goods or the date that the Goods should have been delivered for claims related to loss or damage during the Port-to-Port carriage, and for claims related to loss or damage during Inland Transport the shorter of nine (9) months or any time limit provided for by any applicable international convention, national law, regulation or contract by virtue of clauses 5.2.2 (a) or (b).

10.3 **Jurisdiction** - It is hereby specifically agreed that any suit by the Merchant, and save as additionally provided below any suit by the Carrier, shall be filed exclusively in the High Court of London and English Law shall exclusively apply, unless the carriage contracted for hereunder was to or from the United States of America, in which case suit shall be filed exclusively in the United States District Court, for the Southern District of New York and U.S. law shall exclusively apply. The Merchant agrees that it shall not institute suit in any other court and agrees to be responsible for the reasonable legal expenses and costs of the Carrier in removing a suit filed in another forum. The Merchant waives any objection to the personal jurisdiction over the Merchant of the above agreed fora.

In the case of any dispute relating to Freight or other sums due from the Merchant to the Carrier, the Carrier may, at its sole option, bring suit against the Merchant in the fora agreed above, or in the countries of the Port of Loading, Port of Discharge, Place of Delivery or in any jurisdiction where the Merchant has a place of business.

Top

## 11. MERCHANT-PACKED CONTAINERS

If a Container has not been packed by or on behalf of the Carrier:

11.1 The Merchant shall inspect the Container for suitability for carriage of the Goods before packing it. The Merchant's use of the Container shall be prima facie evidence of its being sound and suitable for use.

11.2 The Carrier shall not be liable for loss of or damage to the Goods caused by:

(a) the manner in which the Goods have been packed, stowed, stuffed or secured in the Container, or

(b) the unsuitability of the Goods for carriage in the Container supplied or for carriage by Container between the Ports or Places specified herein, or

(c) the unsuitability or defective condition of the Container or the incorrect setting of any refrigeration controls thereof, provided that, if the Container has been supplied by or on behalf of the Carrier, this unsuitability or defective condition would have been apparent upon inspection by the Merchant at or prior to the time when the Container was packed, or

(d) packing refrigerated Goods that are not properly pre-cooled to the correct temperature for carriage or before the refrigerated Container has been properly pre-cooled to the correct carrying temperature.

11.3 The Merchant is responsible for the packing and sealing of all Merchant-packed Containers and, if a Merchant-packed Container is delivered by the Carrier with an original seal as affixed by the Merchant or customs or security control intact, or the Carrier can establish bona fide circumstances in which the original seal was replaced, the Carrier shall not be liable for any shortage of Goods ascertained upon delivery.

11.4 The Merchant shall indemnify the Carrier against any loss, damage, liability or expense whatsoever and howsoever arising caused by one or more of the matters referred to in clause 11. 2, including but not limited to damage to Container, other cargo and the Vessel.

Top

## 12. REFRIGERATION, HEATING, INSULATION

12.1 Special Containers with refrigeration, heating or insulation shall not be furnished unless contracted for on the front of this Bill of Lading and extra Freight paid. If a carrying temperature is noted on the front of this Bill of Lading, the Merchant shall deliver the Goods to the Carrier at plus or minus 2 degrees Celsius from the noted temperature, and the Carrier shall exercise due diligence to maintain such supply air temperature, plus or minus 2 degrees Celsius while the Goods are in its possession. IT IS THE MERCHANT'S OBLIGATION TO SET AND/OR CHECK THAT THE TEMPERATURE CONTROLS ON THE CONTAINER ARE AT THE REQUIRED CARRYING TEMPERATURE AND TO PROPERLY SET THE VENTS. The Carrier does not undertake to deliver empty refrigerated Containers to the Merchant at any specific temperature. The Carrier has the right but not the obligation to refuse to accept any Container loaded by the Merchant for shipment where the Goods are not or were not loaded into the Container within plus or minus 2 degrees Celsius of the contracted carrying temperature.

12.2 The Merchant must take note that refrigerated Containers are not designed:

(a) to cool or freeze Goods which have been loaded into a Container at a temperature higher than their designated carrying temperature. The Carrier shall not be responsible for the consequences of the Goods being loaded at a higher temperature than that required for the carriage; nor

(b) to monitor and control humidity levels, even if a setting facility exists, and because humidity is influenced by many external factors the Carrier does not guarantee and is not responsible for the maintenance of any intended level of humidity inside any Container.

12.3 The Carrier shall not be liable for any loss or damage to the Goods arising from latent defects, breakdown, defrosting, stoppage of the refrigerating or any other specialised machinery, plant, insulation and/or apparatus of the Container and any other facilities, provided that the Carrier exercised due diligence before releasing the empty Container to the Shipper.

12.4 The Carrier does not warrant refrigeration or heating machinery, but shall exercise care in its operation and maintenance while in the actual possession of the Carrier. The Carrier will not accept responsibility for the recording of temperatures in any form other than any reefer log book maintained on board the Vessel. The Carrier does not accept to comply with any governmental program or protocol unless noted on the front hereof and additional Freight is paid.

Top

## 13. INSPECTION OF GOODS AND SPECIAL CIRCUMSTANCES

**Inspection** - The Carrier shall be entitled, but shall be under no obligation, to open and/or scan any package or Container at any time and to inspect, verify and weigh the contents without notice to the Merchant.

**Special circumstances** - If it appears at any time that the Goods cannot safely or properly be carried or carried further, either at all or without incurring any additional expense or taking any measures in relation to the Container or the Goods, the Carrier may without notice to the Merchant (but as his agent only) take any measures and/or incur any reasonable additional expense to carry or to continue the carriage of the Goods, and/or to sell or dispose of them and/or to abandon the carriage and/or to store them ashore or afloat, under cover or in the open, at any place, whichever the Carrier in its absolute discretion considers most appropriate, and any sale, disposal, abandonment or storage shall be deemed to constitute due delivery under this Bill of Lading. The Merchant shall indemnify the Carrier against any additional expense so incurred. The Carrier in exercising the liberties contained in this clause shall not be under any obligation to take any particular measures and shall not be liable for any loss, delay or damage howsoever arising from any action or lack of action under this clause.

Top

## 14. DESCRIPTION OF GOODS AND MERCHANT'S RESPONSIBILITY

14.1 This Bill of Lading shall be prima facie evidence of the receipt by the Carrier in apparent good order and

condition, except as otherwise noted, of the total number of Containers or other packages or units indicated in the box entitled "Carriers Receipt" on the front hereof.

14.2 No representation is made by the Carrier as to the weight, contents, measure, quantity, quality, description, condition, temperature, marks, numbers or value of the Goods and the Carrier shall be under no responsibility whatsoever in respect of such description or particulars.

14.3 The Merchant warrants to the Carrier that the particulars relating to the Goods as set out on the front hereof have been checked by or on behalf of the Merchant on receipt of this Bill of Lading and that such particulars, and any other particulars furnished by or on behalf of the Merchant, are adequate and correct. The Merchant warrants that the Goods are safely and securely packed in the Container.

14.4. The Merchant also warrants that the Goods and/or Merchant-packed Containers are lawful Goods, contain no contraband, drugs, other illegal substances or stowaways, and that any hazardous or potentially dangerous characteristics of the Goods have been fully disclosed by or on behalf of the Merchant and that they will not cause loss, damage or expense to the Carrier, or to any other cargo, Containers, Vessel or Person during the carriage.

14.5 If any particulars of any letter of credit and/or import license and/or sales contract and/or invoice or order number and/or details of any contract to which the Carrier is not a party are shown on the front hereof, such particulars are shown at the sole risk of the Merchant and for his convenience. The Merchant agrees that such particulars shall not be regarded as a declaration of value and shall in no circumstances whatsoever increase the Carrier's liability under this Bill of Lading, and the Merchant agrees to indemnify the Carrier for any increased liability so caused, including reasonable legal expenses and costs.

14.6 The Merchant shall comply with all regulations or requirements of customs, port and other authorities, and shall bear and pay all duties, taxes, fines, imposts, expenses or losses (including, without prejudice to the generality of the foregoing Freight for any additional carriage undertaken), incurred or suffered by reason thereof, or by reason of any illegal, incorrect or insufficient declaration, marking, numbering or addressing of the Goods, and shall indemnify the Carrier in respect thereof, including reasonable legal expenses and costs.

14.7 If by order of the authorities at any place, Goods are detained and/or seized and/or a Container has to be opened for the Goods to be inspected for any reason whatsoever, including but not limited to for a breach or infringement of a trademark, patent or other intellectual property right, the Carrier will not be liable for any loss or damage whatsoever incurred as a result of any opening, unpacking, inspection, re-packing, detention, destruction or delay. The Carrier shall be entitled to recover from the Merchant all charges, fines, costs, losses and expenses, including reasonable legal expenses and costs resulting from such action, including but not limited to any detention, demurrage and storage charges for the Goods and/or the Container.

14.8 The Carrier allows a period of free time for the use of the Containers and other equipment in accordance with the Tariff and as advised by the local MSC agent at the Ports of Loading and Discharge. Free time commences from the day the Container and other equipment is collected by the Merchant or is discharged from the Vessel or is delivered to the Place of Delivery as the case may be. The Merchant is required and has the responsibility to return to a place nominated by the Carrier the Container and other equipment before or at the end of the free time allowed at the Port of Discharge or the Place of Delivery. Demurrage, per diem and detention charges will be levied and payable by the Merchant thereafter in accordance with the Tariff.

14.9 The Merchant shall redeliver, to a place nominated by the Carrier, the Containers and other equipment in like good order and condition, undamaged, empty, odour free, cleaned and with all fittings installed by the Merchant removed and without any rubbish, dunnage or other debris inside. The Merchant shall be liable to indemnify the Carrier for any and all costs incurred reinstating or replacing Containers and other equipment not returned in the condition as specified above, including the reasonable legal expenses and costs of recovering the costs incurred and interest thereon.

Top

## 15. DANGEROUS OR HAZARDOUS GOODS

15.1 The Carrier will not accept any Goods of a dangerous or hazardous nature without prior written notice of their full and true particulars and the Carrier's written approval to carry them.

When the Merchant delivers Goods of a dangerous or hazardous nature to the Carrier, the Merchant shall fully inform the Carrier in writing of the precise and accurate details of the Goods, and special precautions or handling required for the Goods. Such Goods shall be distinctly marked on the outside of the Container as well as on the outside of the packaging inside the Container so as to indicate the nature thereof and the marking must comply with the requirements of any applicable regulations, including regulations contained in any relevant international treaty or convention.

15.2 The Merchant shall be fully liable for and shall indemnify, hold harmless and defend the Carrier, its servants, agents and subcontractors and any third party for all loss, damage, delay, personal injury, death or expenses including fines and penalties, and all reasonable legal expenses and costs caused to the Carrier, the Vessel, any cargo, and other property, whether on board or ashore, arising from such Goods and/or from the breach of clause 15.1, whether or not the Merchant was aware of the nature of such Goods.

15.3 Nothing contained in this clause shall deprive the Carrier of any of its rights provided for elsewhere.

Top

## 16. FREIGHT AND CHARGES

16.1 Freight has been calculated on the basis of the Shipper's particulars and if such particulars are found to be erroneous and additional Freight is payable, the Merchant shall be liable therefor and also for any expense thereby incurred.

16.2 All Freight is earned and due upon receipt of the Goods by the Carrier, whether the Freight is prepaid or collect and the Carrier shall be entitled to all Freight due under all circumstances, ship and/or cargo lost or not lost or the voyage abandoned. All Freight shall be paid when due without any set-off, counter claim, or deduction.

16.3 Every Person defined as "Merchant" in clause 1 shall be jointly and severally liable to the Carrier for the payment of all Freight and charges and for the performance of the obligations of each of them hereunder. Any Person engaged by the Merchant to perform forwarding services with respect to the Goods shall be considered to be exclusively the Merchant's agent for all purposes, and any payment of Freight to such Person shall not be considered payment to the Carrier in any event whatsoever. Failure of such third parties to pay any part of the Freight to the Carrier shall be considered a default by the Merchant in the payment of Freight.

Top

## 17. CARRIER'S LIEN

The Carrier, its servants or agents shall have a lien on the Goods and any document relating thereto for Freight and for general average contributions to whomsoever due. The Carrier, its servants or agents shall also have a lien against the Merchant on the Goods and any document relating thereto for all sums due from the Merchant to the Carrier under any other contract. The Carrier may exercise its lien at any time and any place in its sole discretion, through the action of any servant, agent or Subcontractor, whether the contractual carriage is completed or not. The Carrier's lien shall also extend to cover the cost and legal expense of recovering any sums due. The Carrier shall have the right to sell any Goods liened by public auction or private treaty, without notice to the Merchant. Nothing herein shall prevent the Carrier from recovering from the Merchant the difference between the amount due to the Carrier and the net amount realised by such sale.

Top

## 18. OPTIONAL STOWAGE, DECK CARGO AND LIVESTOCK

18.1 Goods, whether packed in Containers or not, may be carried on deck or under deck without notice to the

Merchant unless it is specifically stipulated on the front hereof that the Containers or Goods will be carried under deck. If carried on deck, the Carrier shall not be required to note, mark or stamp on the Bill of Lading any statement of such on-deck carriage. Save as provided in clause 18.2 such Goods (except livestock) carried on or under deck and whether or not stated to be carried on deck shall participate in general average and shall be deemed to be within the definition of Goods for the purpose of the Hague Rules or the COGSA or any compulsorily applicable legislation and shall be carried subject to such Rules or Act, whichever is applicable.

18.2. Goods which are out of gauge and/or are stowed on or in open top containers, flatracks or platforms, and which are stated on the front hereof to be carried on deck, and all livestock whether carried on deck or under deck, are carried without any responsibility whatsoever on the part of the Carrier for loss or damage of whatsoever nature or delay arising during the carriage whether caused by unseaworthiness or negligence or any other cause whatsoever and the Hague Rules or the COGSA shall not apply.

Top

## 19. MATTERS ADVERSELY AFFECTING CARRIER'S PERFORMANCE

19.1 If at any time the carriage is or is likely to be affected by any hindrance, risk, danger, delay, difficulty or disadvantage of whatsoever kind and howsoever arising which cannot be avoided by the Carrier by the exercise of reasonable endeavours, (even though the circumstances giving rise to such hindrance, risk, danger, delay, difficulty or disadvantage existed at the time this contract was entered into or the Goods were received for the carriage) the Carrier may at its sole discretion and without notice to the Merchant and whether or not the carriage is commenced either:

(a) carry the Goods to the contracted Port of Discharge or Place of Delivery, whichever is applicable, by an alternative route to that indicated in this Bill of Lading or that which is usual for Goods consigned to that Port of Discharge or Place of Delivery; or

(b) suspend the carriage of the Goods and store them ashore or afloat upon the terms and conditions of this Bill of Lading and endeavour to forward them as soon as possible, but the Carrier makes no representations as to the maximum period of suspension; or

(c) abandon the carriage of the Goods and place them at the Merchant's disposal at any place or port which the Carrier may deem safe and convenient, or from which the Carrier is unable by the exercise of reasonable endeavours to continue the carriage, whereupon the responsibility of the Carrier in respect of such Goods shall cease. The Carrier shall nevertheless be entitled to full Freight on the Goods received for the carriage, and the Merchant shall pay any additional costs incurred by reason of the abandonment of the Goods. If the Carrier elects to use an alternative route under clause 19.1 (a) or to suspend the carriage under clause 19.1 (b) this shall not prejudice its right subsequently to abandon the carriage.

19.2 If the Carrier elects to invoke the terms of this clause 19, then notwithstanding the provisions of clause 9, the Carrier shall be entitled to such additional Freight and costs as the Carrier may determine.

Top

## 20. NOTIFICATION AND DELIVERY

20.1 Any mention in this Bill of Lading of parties to be notified of the arrival of the Goods is solely for information of the Carrier. Failure to give such notification shall not subject the Carrier to any liability nor relieve the Merchant of any obligation hereunder.

20.2 The Merchant shall take delivery of the Goods within the time provided for in the Carrier's applicable Tariff or as otherwise agreed. If the Merchant fails to do so, the Carrier may without notice unpack the Goods if packed in Containers and/or store the Goods ashore, afloat, in the open or under cover at the sole risk of the Merchant. Such storage shall constitute due delivery hereunder, and thereupon all liability whatsoever of the Carrier in respect of the Goods, including for misdelivery or non-delivery, shall cease and the costs of such storage shall forthwith upon demand be paid by the Merchant to the Carrier.

20.3 If the Goods are unclaimed within a reasonable time or whenever in the Carrier's opinion the Goods are likely to deteriorate, decay or become worthless, or incur charges whether for storage or otherwise in excess of their value, the Carrier may at its discretion and without prejudice to any other rights which it may have against the Merchant, without notice and without any responsibility attaching to it, sell, abandon or otherwise dispose of the Goods at the sole risk and expense of the Merchant and apply any proceeds of sale in reduction of the sums due to the Carrier from the Merchant under or in connection with this Bill of Lading.

20.4 Refusal by the Merchant to take delivery of the Goods in accordance with the terms of this clause and/or to mitigate any loss or damage thereto shall constitute an absolute waiver and abandonment by the Merchant to the Carrier of any claim whatsoever relating to the Goods or the carriage thereof. The Carrier shall be entitled to an indemnity from the Merchant for all costs whatsoever incurred, including legal costs, for the cleaning and disposal of Goods refused and/or abandoned by the Merchant.

Top

## 21. BOTH TO BLAME COLLISION CLAUSE

If the Vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the Vessel, the owners of the Goods carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said Goods, paid or payable by the other or non-carrying ship or her owners to the owners of said Goods and set-off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the Vessel or Carrier. The foregoing provisions shall also apply where the owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect of a collision or contact.

Top

## 22. GENERAL AVERAGE AND SALVAGE

General Average shall be adjusted, stated and settled at any port or place at the Carrier's option according to York - Antwerp Rules 1994 except Rule XXII and, as to matters not therein provided for, according to the laws and usages at any port or place at the Carrier's option. General Average on a Vessel not operated by the Carrier shall be adjusted according to the requirements of the operator of that Vessel. Average agreement or bond and such cash deposit (payable at Carrier's option in United States currency) as the Carrier may require as additional security for the contribution of the Goods and salvage and special charges thereon, shall be furnished before delivery or forwarding.

In the event of accident, danger, damage or disaster, before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Carrier is not responsible by statute, contract, or otherwise, the Goods and the Merchant shall, jointly and severally, contribute with the Carrier in General Average to the payment of any sacrifices, losses, or expenses of a General Average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the Goods, as determined by an independent General Average adjuster duly appointed by the Carrier, and his determination as to liability for General Average contribution and his computation for the same shall be final and binding on all parties to the venture. If a salving ship is owned or operated by the Carrier, salvage shall be paid for as fully and in the same manner as if such salvaging ship or ships belonged to strangers. Such deposit as the Carrier or its agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the Goods, Shippers, Consignees or owners of the Goods to the Carrier before delivery.

Top

## 23. SEPARABILITY AND VARIATION OF TERMS, FINAL CONTRACT

The terms of this Bill of Lading shall be separable and, if any term or provision hereof or any part of any term or provision shall be invalid to any extent, it shall be invalid to that extent, but no further and such circumstance shall not affect the validity or enforceability of any other term or provision hereof. This Bill of Lading is the final contract between the parties which supersedes any prior agreement or understanding, whether in writing or verbal, save where this Bill of Lading has been issued pursuant to another contract between the Merchant and the Carrier, when such other contract and this Bill of Lading shall be construed together. This Bill of Lading and its terms and conditions may not be changed orally.

Back | Top

---

Mediterranean Shipping Company, S.A. 40, Avenue Eugène-Pittard - CH-1206, Geneva - Switzerland
Tel : +41 22 703 8888 - Fax: +41 22 703 8787 - Email: info@mscgva.ch

© Copyright 1996-2009 - MSC S.A
All Rights Reserved

*MEDITERRANEAN SHIPPING COMPANY (USA) INC.*

**Exhibit C to Verified Complaint**

# MEDITERRANEAN SHIPPING COMPANY

420 5th Avenue New York, N.Y. 10018

tel. (212) 764 4800   fax (212) 827 1650

February 17, 2008


INTERNATIONAL FIBER EXCHANGE
213 A SECOND STREET
Sausalito, CA 94965


RE:    B/L MSCUBT200132,
Container MSCU9180595, MSCU8870826,
Shipper's reference I-3663.1


Dear Sir/Madam:

Please be advised that the referenced container(s) was/were discharged from the MSC BRIANNA 141A at NAHAV SHEVA on 21 SEPTEMBER, 2007. As of this date, the container(s) is/are sitting at yard awaiting clearance by consignee.

We are writing to advise you that, pursuant to the Terms and Conditions of the referenced Bill of Lading, you are jointly and severally liable for any and all charges associated with the continuing use (once free time has expired) and storage of this/these container(s).  In the event that this/these container(s) is/are not retrieved within ten days from this notice, we shall begin/continue arrangements to have it/them emptied, cleaned (if necessary) and returned to MSC.  This process can take several months, sometimes years to complete.  In the event emptying container(s) is not an option for local Customs, unit(s) will be disposed of.
Any and all charges associated with the emptying, cleaning, repositioning of this/these container(s), and/or unit value for disposal will be for your account.

You should also be advised that we may dispose of the contents of the referenced container(s) in such manner as we, in our sole discretion, deem appropriate and that you are, once again, jointly and severally liable for any and all costs associated therewith. You should be guided accordingly.

Very truly yours,


Ulrike Woggon
Abandoned Cargo Deptartment


cc: Samuel Conte, Esq.

*MEDITERRANEAN SHIPPING COMPANY (USA) INC.*

**Exhibit D to Verified Complaint**

 **MEDITERRANEAN SHIPPING COMPANY (USA) INC.**
420 Fifth Ave. New York, NY 10018
PHONE: 212-764-4800
FAX: 212-764-6599

Date: 30-Mar-09

Bill to:

INTERNATIONAL FIBER EXCHANGE
213 A SECOND
STREET
Sausalito, CA 94965

Invoice Number:    **MM-BT200132** "to 5000 Legal Account"
BOL#:              MSCUBT200132
Ref:               I-3663.1
Issued by:         MMereu - MSC NYC

| Item | Port Depot | BOL Number | Eq Number | Unit Price | Qty | Amount |
|---|---|---|---|---|---|---|
| abandon cargo settlement | Nhava Sheva | MSCUBT200132 | MSCU9180595/MSCU8870826 | 147,585.75 | 1 | $147,585.75 |
| adm. fee | Nhava Sheva | MSCUBT200132 | MSCU9180595/MSCU8870826 | 50.00 | 1 | $50.00 |
| | | | | | **Total Due:** | $147,635.75 |

The Chase Manhattan Bank ABA 0210-0002-1
345Hudson Street
New York, NY 10014
Account Title:     Mediterranean Shipping Company (USA) Inc.
420 Fifth Ave., New York, NY 10018
Account No: 011-4-018229

Please be sure to include your Bill of Lading no. with your transfer. Please also send an email to
UAC@MSC.US to insure that all charges are applied accordingly and in a timely manner.



**MEDITERRANEAN SHIPPING COMPANY (USA) INC.**
420 Fifth Ave. New York, NY 10018
PHONE: 212-764-4800
FAX: 212-764-6599

Date: 30-Apr-09

Bill to:

INTERNATIONAL FIBER EXCHANGE
213 A SECOND
STREET
Sausalito, CA 94965

Invoice Number: **MM-BT200132** "to 5000 Legal Account"
BOL#: MSCUBT200132
Ref: I-3663.1
Issued by: MMereu - MSC NYC

| Item | Port Depot | BOL Number | Eq Number | Unit Price | Qty | Amount |
|---|---|---|---|---|---|---|
| abandon cargo settlement | Nhava Sheva | MSCUBT200132 | MSCU9180595/MSCU8870826 | 147,585.75 | 1 | $147,585.75 |
| adm. fee | Nhava Sheva | MSCUBT200132 | MSCU9180595/MSCU8870826 | 50.00 | 1 | $50.00 |
| | | | | | **Total Due:** | $147,635.75 |

The Chase Manhattan Bank ABA 0210-0002-1
345Hudson Street
New York, NY 10014
Account Title:     Mediterranean Shipping Company (USA) Inc.
                   420 Fifth Ave., New York, NY 10018
                   Account No: 011-4-018229

Please be sure to include your Bill of Lading no. with your transfer. Please also send an email to
UAC@MSC.US to insure that all charges are applied accordingly and in a timely manner.



# MEDITERRANEAN SHIPPING COMPANY (USA) INC.

420 Fifth Ave. New York, NY 10018
PHONE: 212-764-4800
FAX: 212-764-6599

Date: 8-Jun-09

Bill to:      INTERNATIONAL FIBER EXCHANGE
              213 A SECOND
              STREET
              Sausalito, CA 94965

Invoice Number:   **MM-BT200132**  "to 5000 Legal Account"
BOL#:             MSCUBT200132
Ref:              I-3663.1
Issued by:        MMereu - MSC NYC

### THIRD AND LAST INVOICE BEFORE LEGAL ACTION

| Item | Port Depot | BOL Number | Eq Number | Unit Price | Qty | Amount |
|------|-----------|-----------|-----------|-----------|-----|--------|
| abandon cargo settlement | Nhava Sheva | MSCUBT200132 | MSCU9180595/MSCU8870826 | 147,585.75 | 1 | $147,585.75 |
| adm. fee | Nhava Sheva | MSCUBT200132 | MSCU9180595/MSCU8870826 | 50.00 | 1 | $50.00 |
| | | | | | **Total Due:** | $147,635.75 |

The Chase Manhattan Bank ABA 0210-0002-1
345Hudson Street
New York, NY 10014
Account Title:      Mediterranean Shipping Company (USA) Inc.
                    420 Fifth Ave., New York, NY 10018
                    Account No: 011-4-018229

Please be sure to include your Bill of Lading no. with your transfer. Please also send an email to
UAC@MSC.US to insure that all charges are applied accordingly and in a timely manner.